# 97 DTA 116

### TRIBUNAL DE CIRCUITO DE APELACIONES
### CIRCUITO REGIONAL IV DE AGUADILLA Y MAYAGUEZ

IRIS ECHEVARRIA CRUZ, SU ESPOSO FELIX VILANOVA ORTIZ Y LA
SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Demandante-Apelada

v.

MAYAGUEZ MALL; EMPRESAS PUERTORRIQUEÑAS DE DESARROLLO, INC.;
GENERAL ACCIDENT, JOHN DOE Y RICHARD DOE
Demandadas-Apelantes

Núm. KLAN-96-00868

San Juan, Puerto Rico, a 12 de mayo de 1997

Panel integrado por su Presidente, Juez Rossy García
y los Jueces Martínez Torres y Rodríguez García

Rossy García, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El recurso instado en el caso de epígrafe interesa la revisión y revocación de una sentencia emitida por el Tribunal de Primera Instancia, Sub-sección de Distrito, Sala de Mayaguez, Manuel A. Acevedo Hernández, J.) copia de cuya notificación fue archivada en autos el 30 de julio de 1996. Mediante ésta, dicho foro declaró CON LUGAR la acción en daños y perjuicios incoada por la demandante-apelada. Al así dictaminar condenó a los demandados-apelantes a satisfacer la suma de siete mil dólares ($7,000.00), correspondiente dicha cantidad al valor del vehículo propiedad de los demandantes, el que alegadamente les fue hurtado mientras permanecía aparcado en el estacionamiento del Mayaguez Mall. Les impuso, además, las costas del proceso más la cantidad de quinientos dolares ($500.00) por concepto de honorarios de abogado. ■

Inconforme con la determinación alcanzada por dicho foro, acuden ante nos los demandados-apelantes mediante la interposición del recurso que nos ocupa, en el que imputan la comisión de los siguientes errores:

*"a) Erró el Honorable Tribunal de Instancia al entender que la Parte Demandante-Apelada probó la negligencia de los Demandados-Apelados en la operación del sistema de seguridad y vigilancia.*

*b) Erró el Honorable Tribunal de Instancia al descartar de plano toda la prueba aportada por el testigo de la parte Demandada, Juan Andrew González.*

*c) Erró el Honorable Tribunal de instancia al emitir determinaciones de hechos que son contrarias a la prueba desfilada y la cual no fue controvertida."*

Encontrándonos en condición de dictaminar luego de un cuidadoso análisis del recurso instado a la luz de los escritos presentados; los documentos incluidos en los respectivos apéndices; la exposición

narrativa de la prueba oral sometida por las partes; así como del derecho aplicable y su jurisprudencia interpretativa, resolvemos que resulta procedente emitir sentencia revocatoria de la apelada.

Surge de los autos que por hechos acontecidos el 27 de abril de 1994, en horas de la tarde, cuando alegadamente fue hurtado un vehículo propiedad de los demandantes mientras lo dejaron aparcado en el estacionamiento del Mayaguez Mall, éstos instaron acción civil contra los aquí apelantes. Alegaron, en síntesis, que el hurto del referido vehículo se debió a la culpa o negligencia de la parte demandada, y que los demandados-apelantes se habían negado a satisfacer suma alguna por el valor del vehículo, el que estimaron en la cantidad de $7,000.00. Reclamaron, además, la suma de $1,000.00 por la pérdida de uso, más intereses, costas y honorarios de abogado. ▮

Emplazados los demandados, presentaron su contestación a la demanda en tiempo oportuno. En la misma, negaron por falta de información las alegaciones básicas de la demanda. En oposición y como defensa afirmativa, alegaron que *"Empresas Puertorriqueñas de Desarrollo, Inc. mantiene un sistema de seguridad adecuado y diligente para las necesidades de sus clientes y visitantes [y que] Empresas h/n/c Mayaguez Mall no es asegurador absoluto de la propiedad y seguridad de los visitantes a dicho centro comercial".* ▮

Luego del trámite correspondiente y habiendo agotado las partes los mecanismos de descubrimiento de prueba, se celebró una conferencia en antelación a juicio en cuya ocasión las partes, luego de anunciar la prueba que habrían de aportar en apoyo a sus respectivas contenciones, convinieron en limitar las controversias a la determinación de responsabilidad de los demandados por el hurto del vehículo. En cuanto a este extremo, fue la contención de los demandados-apelantes que *"[habían tomado] todas las medidas a su alcance para prevenir el hurto de los vehículos de sus clientes",* adoptando *"medidas prudentes y razonables de seguridad"* para proteger a sus visitantes, ello para afirmar que *Empresas Puertorriqueñas de Desarrollo, Inc. no es un asegurador absoluto de sus visitantes contra actuaciones criminales de vándalos en el centro comercial".* ▮

Fue así señalada la vista en su fondo para el 11 de octubre de 1995, a la que comparecieron las partes asistidas por sus respectivos abogados. Según surge de la Exposición Narrativa sometida por las partes, la que mereció la aprobación del foro de instancia, la prueba testifical aportada durante la vista en su fondo consistió del testimonio de la co-demandante Iris Echevarría Cruz y aquél del Sr. Juan Andrew González, este último administrador del Mayaguez Mall. Sometieron, además, prueba documental que fue admitida sin mediar oposición de partes y a la que más adelante habremos de referirnos.

En lo que respecta a la prueba de la parte demandante, el testimonio de la Sra. Echevarría Cruz fue a los efectos de que el 27 de abril de 1994 llegó al Mayaguez Mall aproximadamente a la 1:55 de la tarde en un vehículo de su propiedad, marca Oldsmobile Cutlass Supreme, Modelo 1986, con tablilla BFP-894, con el propósito de realizar un depósito en la sucursal del Banco Popular en dicho centro comercial. Indicó que aparcó su vehículo en el área de estacionamiento frente al Restaurant Mr. Cook y la Repostería Tiffany's. Luego de efectuar la transacción bancaria compró almuerzo en Mr. Cook para llevárselo a su oficina. Atestó que al salir y siendo las 2:15 pm., no encontró su vehículo, habiendo observado al ir de camino a Mr. Cook que en la garita que ubica en el techo de Citibank había un guardia de seguridad vigilando. Luego de cerciorarse de que, efectivamente, el auto no estaba donde lo dejó estacionado y de hacer una llamada telefónica a su trabajo, regresó al área de estacionamiento, donde observó un guardia de seguridad en motora que daba vueltas fila por fila. Indicó que le informó a éste lo acontecido, personándose luego otro miembro del equipo de vigilancia, el Sr. Castillo, quien estaba apostado en la *"garita"* de observación que corresponde al Citibank, localizada a unos cien (100) metros del lugar del incidente. ▮ Expresó que éstos le informaron que habrían de cotejar y que informarían del incidente a la Policía Estatal, quien opera un Cuartel en el centro comercial en facilidades provistas a tales efectos, lo que hicieron. Concluyó su testimonio indicando que un oficial de la Policía de Puerto Rico la visitó en su lugar de trabajo con relación al hurto del vehículo y tomó la información relacionada con la querella. ▮

De otra parte, la Sra. Echevarría notificó y sometió personalmente una reclamación a la administración del Mayaguez Mall al día siguiente de los referidos hechos. En lo que respecta al valor del vehículo indicó que lo compró en el año 1991 y pago $9,900.00, incluyendo los intereses

correspondientes al financiamiento.

La prueba de la parte demandada-apelante consistió del testimonio del Ing. Juan Andrew González, administrador del Mayaguez Mall y encargado de los aspectos de seguridad, lo cual incluye la vigilancia y seguridad de los terrenos, edificios, equipos y facilidades del referido centro comercial. Se sometió en evidencia, además, por estipulación de partes, un plano que ilustra la localización de las estructuras que componen el referido centro comercial, el que refleja también las garitas o puntos de observación que están ubicadas estratégicamente en el techo de los edificios que componen el Mayaguez Mall, las que tienen el propósito de lograr control visual de todo el estacionamiento de dicho centro comercial. Ofreció también la demandada, y se admitieron sin mediar oposición, fotografías del área donde alegadamente ocurrió el hurto del vehículo en controversia; copia del contrato de servicio de vigilancia suscrito por el Mayaguez Mall con la Wells Fargo; declaración jurada suscrita por Carlos Echevarría Cruz; así como la Deposición que le fue tomada a la Sra. Iris Echevarría Cruz, en específico a las págs. 12 y 13. Se admitió, además, sin oposición de la parte demandante, copia de la bitácora en la que se registró la asistencia de los empleados de seguridad que ofrecieron dicho servicio el día de los alegados hechos, y en la que se consignan las incidencias del día por cada uno de los guardias de turno. ■

En lo que respecta al testimonio del Sr. Andrew González, para mayor claridad de nuestro dictamen, procedemos a transcribirlo íntegramente según expuesto en la Exposición Narrativa sometida a los fines del perfeccionamiento del recurso. Su testimonio fue así, a los siguientes efectos:

*"Soy el empleado de mayor jerarquía a Mayaguez Mall, ya que los ejecutivos de mayor jerarquía están asignados a las oficinas de San Juan.*

*Soy el encargado de las estructuras de seguridad de Mayaguez; lo cual incluye la vigilancia y seguridad de todos nuestros terrenos, edificios, equipo y facilidades. El Teniente José Arroyo es empleado de Empresas Puertorriqueñas de Desarrollo, Inc. y es el supervisor directo, de parte nuestra, de los guardias de seguridad motorizados; de los que vigilan en las garitas y los guardias de los pasillos centrales del centro comercial.*

*El sistema de seguridad de Mayaguez Mall estaba estructurado así allá para el 27 de abril de 1994.*

*a) garitas de seguridad contratadas de Wells Fargo Armored Services, Inc. los cuales se ubican en garitas, motoras y en los pasillos de centro comercial [sic].*

*b) empleados de mantenimiento que, aunque no prestan vigilancia, tienen instrucciones de comunicarse con la oficina de administración si se percatan de la ocurrencia de algún incidente.*

*c) garitas o casetas que ubican en el techo de los edificios que componen a Mayaguez Mall y los portones de las áreas de cargas; las cuales ubican en Wal-Mart; en el portón de las torres del sistema de aire acondicionado; en la antigua tienda González Padín; en Sears, Citibank. Desde dichas garitas se logra control visual de todas las áreas de estacionamiento de Mayaguez Mall.*

*Cada guardia tiene asignado un radio de comunicaciones; con acceso a la oficina. Los guardias asignados a las garitas tienen binoculares y radio de comunicaciones. Los guardias 24 horas al día motorizados, tres por turno, patrullan Mayaguez Mall.*

*d) un cuartel de la división de tránsito de la Policía de Puerto Rico es ofrecido a dicha agencia libre de costos y al cual están asignados numerosos vehículos que constantemente entran y salen de Mayaguez Mall. Obviamente, ese cuartel no existe allí para vigilar a Mayaguez Mall, pero se le ofrece el local libre de costo por el efecto disuasivo de la delincuencia que tiene su presencia en Mayaguez Mall.*

*Mis conocimientos en el área de seguridad provienen de la asistencia a seminarios y reuniones que ofrece la División de Vehículos Hurtados de la Policía de Puerto Rico, las cuales se celebran anualmente. Asisto a seminarios en materia de seguridad que ofrecen centros comerciales; recibimos*

*revistas de entidades agrupan a operadores de centros comerciales cuales tratan el tema de la seguridad.*

*Empresas Puertorriqueñas de Desarrollo, Inc. gasta alrededor de $400,000 00 al año para la operación de su sistema de seguridad; lo cual incluye pagos a la compañía de guardias, equipo, personal de supervisión, etcétera.*

*En el caso de doña Iris Echevarría Cruz se alega que el vehículo de ésta, Oldsmobile Cutlass Supreme, Modelo 1986, estaba estacionado el 27 de abril de 1994, a eso de las 1:55 de tarde en las inmediaciones del Restaurant Mr. Cook, cercano a Citibank. Cuando regresó a buscar su vehículo alrededor de veinte minutos más tarde encontró que había desaparecido. Esto ocurrió el viernes 27 de abril de 1994.*

*Ese día; a esa hora la vigilancia en Mayaguez Mall consistía de:*

*a) Cuartel de la Policía de Puerto Rico, División de Tránsito en la parte posterior de Mayaguez Mall.*

*b) Guardias de pasillo-uno en cada pasillo interior.*

*c) Guardias de motora-tres, uno para cada área de estacionamiento.*

*d) Guardias en todas las garitas, inclusive uno en el portón del área de carga que ubica frente al área donde estacionó la demandada.*

*Específicamente en ese momento esa área era vigilada por una motora con un guardia de Wells Fargo y había un guardia de seguridad [sic] la garita que ubica en el techo de Citibank; próximo al área donde estacionó la demandante.*

*He estudiado personalmente el desempeño de los guardias motorizados y he cronometrado que tarden entre 10 a 15 minutos en recorrer su área asignada; pasando por el frente de cada vehículo.*

*En Mayaguez Mall el crimen violento es inexistente. No hemos tenido incidencia de asesinatos, violaciones, secuestros, tiroteos, agresiones, robos, escalamientos, etc. Fuera de algún hurto de vehículo, no tenemos incidencia criminal significativa. A la luz de el [sic] grado de incidencia criminal que nos afecta, hemos establecido nuestro sistema de vigilancia y seguridad.*

*Yo, personalmente, (Juan Andrew González) me reúno periódicamente con los oficiales de la División de Vehículos Hurtados de la Policía de Puerto Rico, para evaluar nuestra problemática en materia del hurto de vehículo de motor. En épocas y días de mucho movimiento [en] Mayaguez Mall (Navidad, Día de Madres, Día de Padres, etc..) la División de Vehículos de Motor establece vigilancia se coordina conmigo y se les presta equipo tales como radios portátiles de comunicación, binoculares, etc.. En adición a lo antes expuesto, la Policía de Puerto Rico, Distrito de Mayaguez también patrulla en el sector de Mayaguez Mall pertenenciente a la jurisdicción de Mayaguez. Igualmente, el Distrito de Hormigueros patrulla el sector de Hormigueros. Esta última vigilancia la prestan a diario; irrespectivo de la época del año.*

*Los guardias se registran al llegar a trabajar y firman en un libro de bitácora; con su hora de entrada y su hora de salida; exponiendo cualquier incidente que haya sobrevenido en su turno.*

*En este caso la demandante Iris Echevarría Cruz fue atendida por el guardia Antonio Castillo y por el guardia de que [sic] vigilaba en la garita que ubica en el techo de Citibank.*

*En los seminarios que nos ofrece la División de Vehículos Hurtados de la Policía de Puerto Rico he aprendido sobre técnicas de los maleantes para hurtar vehículos de motor, así como el perfil de este tipo de delincuente. Tratáse de un delincuente sofisticado, rápido en el desempeño de su gestión criminal; el cual utiliza herramientas pequeñas. En muchas ocasiones este tipo de delincuente utiliza el sistema de "limar" una llave en las inmediaciones para prender el vehículo a ser hurtado. Se sabe*

*que en ocasiones el maleante prende el vehículo, entonces, una mujer lo conduce fuera del centro comercial.*

*Tenemos que ser sumamente cuidadosos como intervenimos con quien entendemos es una persona sospechosa, ya que si intervenimos con un dueño legítimo podríamos estar ante un caso civil de persecución maliciosa.*

*Nuestros guardias motorizados patrullan en motora 24 horas al día; tres turnos de 8 horas los cuales cubren los siguientes territorios.*

*a) uno de Wal-Mart a J.C. Penny y Telefónica*

*b) uno de J.C. Penny-Westernbank a Pueblo y*

*c) otra de Sears a Tienda Capri.*

*Asimismo nuestro pasillo son patrullados [sic] por guardias 24 horas al día; un guardia para cada pasillo. Durante horas laborables, en días de mucho movimiento, las garitas también son ocupadas por guardias. La garita del portón de carga y descarga siempre tiene guardia en horas del día para poder dar acceso a los camiones de los inquilinos.*

*Nuestros empleados de mantenimientos [sic] tienen instrucciones de llamar a los guardias de seguridad si notan conducta anormal de alguna persona o notan algún incidente o acto criminal."*

A base de la prueba antes indicada quedó el caso sometido para adjudicación ante el foro de instancia, quien procedió luego a emitir la sentencia aquí apelada. En la misma, y contrario a la prueba testifical y documental que fue aportada por la demandada-apelante y que fue admitida sin mediar oposición, concluyó que *"el sistema de vigilancia no fue probado"*, así como que *"la parte demandada no tomó precausiones [sic] diligentes";* ello como base para declarar con lugar la demanda. ■ En el proceso, y para así concluir, descartó la prueba aportada por los aquí apelantes determinando que:

*"........*

*14- El testimonio del Sr. Andrew González [ofrecido como prueba testifical de la demandada] no puso en condiciones al tribunal de adjudicar que el plan de vigilancia para la fecha de los hechos operaba adecuadamente. De la prueba desfilada no surgió que el testigo tuviera conocimiento personal que el policía Castillo de la Wells Fargo y otros policías estuvieran patrullando a no ser por lo que explicó del plan. Ninguno de los supervisores de turno de vigilancia compareció como testigo de los demandados para corroborar el plan de seguridad.*

*.........*

*17- No se demostró por los demandados fuera de describir el plan de vigilancia que el día del hurto del vehículo el referido plan funcionó como fue delineado.*

*18- Resultó altamente sospechoso que de la prueba aducida por los demandados ninguno de los guardias de motor, Teniente Arroyo y los Supervisores de la Wells Fargo comparecieron como testigos. Tampoco los alrededor de cincuenta empleados de mantenimiento que vigilan los movimientos sospechosos en el área de los estacionamientos."* ■

Resolvemos que al así dictaminar incidió el foro de instancia, por lo que resulta procedente revocar la sentencia apelada.

## II

Para colocar el recurso que nos ocupa en correcta perspectiva, veamos inicialmente la génesis y la trayectoria jurídica y jurisprudencial que ha exhibido la procedencia de la imposición de responsabilidad a los dueños de establecimientos comerciales por los daños resultantes a un usuario

ocurridos en un área de estacionamiento que opera sin fines de lucro.

Las disposiciones de la Ley para Regular el Negocio de Areas para el Estacionamiento Público de Vehículos de Motor, Ley Núm. 120 de 7 de junio de 1973, según enmendada, 23 L.P.R.A. sec. 805 *et seq*.., reconocen la existencia de dos clases de estacionamiento público: aquéllos que operan dicho negocio *"con ánimo de lucro"*, objeto de las regulaciones contenidas en la referida ley, y aquéllos que la ley identifica en su Art. 14, intitulado *"Excepción"*, a los cuales se refiere como estacionamientos *"sin fines de lucro"*. Al eximir a estos últimos del alcance de sus preceptos, dicho artículo describe a los estacionamientos sin fines de lucro como aquéllos que son operados *"principal y esencialmente como un servicio para conveniencia de los clientes, parroquianos o personas relacionadas con algún negocio o actividad que se lleve a cabo en dicha área de estacionamiento..."*. 23 L.P.R.A. sec. 818.

Ello no obstante, los establecimientos que se benefician por proveer esta facilidad a sus patrocinadores vienen obligados a cumplir con lo ordenado en el Art. 5, por cuyas disposiciones se les exige mantener un seguro de responsabilidad pública para cubrir lesiones y daños a la propiedad ajena, 23 L.P.R.A. sec. 809, cuyo propósito obvio es proteger la efectividad de una adjudicación en la reclamación que pueda ser instada a tales efectos. La diferencia reconocida por la referida ley representó, además, un tratamiento jurídico distinto a la relación de responsabilidad que se crea entre el usuario y el dueño u operador de cada una de estas clases de estacionamiento. Por un lado, la ley dispone que el operador de un estacionamiento público que representa su negocio principal actúa como depositario del vehículo del usuario, 23 L.P.R.A. 812, estatuyendo una presunción de contrato de depósito a favor de este último. Así, se le impone al operador la carga de establecer que tomó las medidas necesarias y diligentes, como un buen padre de familia, al custodiar el objeto entregado en depósito, *M.A. Caribbean Corp. v. Caribbean Rust Roofers, Inc.,* 115 D.P.R. 681, 684 (1984); *Acevedo v. Plaza Las Américas,* 109 D.P.R. 311, 314-315 (1980), según previsto por los preceptos que rigen las obligaciones y los contratos en el Código Civil de P.R., 31 L.P.R.A. sec. 4641 *et seq.* (contrato de depósito) 2991-3261 (obligaciones).

De otra parte, dicha presunción no aplica al operador de un área de estacionamiento que funciona con ánimo indirecto de lucro. En este caso, a aquél que ha sufrido un agravio a su persona o un daño a su propiedad --cuyo daño fuera recibido al utilizar esta segunda clase de estacionamiento-- se le reconoce una causa de acción en daños y perjuicios, en la cual el usuario así perjudicado vendrá obligado a probar la existencia de negligencia bajo la doctrina general de responsabilidad extracontractual. *P. Ricancars v. Plaza Las Américas,* 121 D.P.R. 238, 241-242 (1988), (opinión concurrente del J. Rebollo López); Herminio Brau Del Toro, *Los Daños y Perjuicios Extracontractuales en Puerto Rico,* **Publicaciones J.T.S.**, San Juan (1986), págs. 843, 848-849. Evidente resulta de esta distinción que el peso de la prueba en uno y otro caso, al momento de adjudicar responsabilidad, recae sobre actores distintos. Siendo la última situación descrita la que contemplamos en el caso de autos, donde el daño reclamado ocurrió en un estacionamiento operado con ánimo indirecto de lucro, se hace preciso y necesario analizar los postulados básicos de la referida doctrina de responsabilidad extracontractual y el tratamiento que le ha dado la jurisprudencia aplicados a hechos como los que consideramos en el presente recurso.

Como es sabido, en nuestra jurisdicción la regla general que priva en el campo de la responsabilidad extracontractual es que aquél que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, estará obligado a reparar el daño causado. Art. 1802, Código Civil, *supra,* 31 L.P.R.A. sec. 5141. ▮ De dicho principio se desprende que todo perjuicio, sea éste material o moral, da lugar a reparación si concurren tres requisitos o elementos: (1) la ocurrencia de un daño real; (2) la existencia de un nexo causal entre el daño y la acción u omisión de otra persona; y (3) que dicho acto u omisión sea culposo o negligente. *Díaz v. E.L.A.,* 118 D.P.R. 395, 418 (1987); *Pérez Escolar v. Collado,* 90 D.P.R. 806, 811 (1969); *Hernández v. Fournier,* 80 D.P.R. 93, 96-97 (1957). En el caso de la ocurrencia de omisiones, se ha postulado que los factores a considerarse para determinar si tal omisión genera responsabilidad bajo el citado artículo 1802 son (1) la existencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual se constituye en el acto antijurídico y (2) si de haberse realizado el acto, se hubiera evitado el daño. *Soc. de Gananciales v. González Padín,* 117 D.P.R. 94, 106 (1986). Del concurso de ambos factores surge el deber de previsibilidad, toda vez que *"el Art. 1802 gira inevitablemente en torno a la función de previsión del individuo, como factor determinante de su responsabilidad con su congénere"*. *Rivera*

*Pérez v. Cruz Corchado,* 119 D.P.R. 8, 18 (1987). Es decir, la norma de responsabilidad dependerá de la concurrencia de una omisión que constituya conducta afirmativa que aumente el riesgo de daño y que sea razonablemente previsible la ocurrencia del daño, por lo que se crea un deber de prevenirlo. *J.A.D.M. v. Centro Comercial Plaza Carolina, et als.,* 133 D.P.R. ___ (1993), **93 J.T.S. 26,** pág. 10,437.

Ahora bien, lo antes dicho no implica que la obligación de previsibilidad comprenda todo posible riesgo que pueda concebirse en una determinada situación, pues tal exigencia tendría el efecto de imponer una responsabilidad absoluta, *Pacheco v. A.F.F.,* 112 D.P.R. 296, 300 (1982), por lo que se ha considerado que el deber requerido alcanza sólo a aquella situación de peligrosidad que llevaría a una persona prudente a anticiparlo. *Hernández v. La Capital,* 81 D.P.R. 1031, 1038 (1960). Por su parte, el Art. 1803 del referido Código contempla que la obligación que impone el Art. 1802 es exigible también por los actos u omisiones de aquellas personas de quienes se debe responder. 31 L.P.R.A. sec. 5142. De esta manera, se incurre en responsabilidad vicaria por daños causados por un menor, por un incapacitado, por un dependiente, por un agente, y por alumnos o aprendices. ██ Observamos así que el derecho contempla, y ha codificado, las ocasiones en que opera la excepción de responder civilmente por los actos u omisiones de un tercero.

De otra parte, aun cuando es regla generalmente aceptada que no existe un deber de proteger a otros de actos criminales de terceros ██ y, en consecuencia, de responder civilmente por ellos, la doctrina ha identificado situaciones en las cuales a una persona natural o jurídica le pueda ser exigible asumir la responsabilidad por los actos delictivos realizados por un tercero contra el demandante. Así, nuestra jurisprudencia ha reconocido la obligación de ofrecer protección, en posible evitación de daños, en variadas instancias las que incluyen, entre otras, la responsabilidad de instituciones educativas, de hoteles, de dueños de edificios y, como en el caso de autos, la de los centros comerciales. ██ Al adoptar el criterio del tratadista Prosser, nuestro más alto foro ha postulado que en tales casos, la responsabilidad imputada sobreviene cuando el demandado ha propiciado una tentación u oportunidad especial de conducta criminal que le impone la obligación de tomar precauciones contra ellas. Identifica especialmente, entre otras, ██ la *"invitación"* que el empresario le extiende a su negocio a un potencial cliente. ██ No obstante, adecuado resulta enfatizar en el hecho de que todas estas situaciones se siguen evaluando bajo el criterio rector de que sólo habrá responsabilidad si el demandado es negligente en no tomar precauciones contra los posibles actos criminales, tomando como punto de partida la previsibilidad del riesgo envuelto y si la dimensión de tal riesgo es irrazonable comparada con el peso de implantar tales medidas cautelares. *J.A.D.M. v. Centro Comercial Plaza Carolina, et als., supra,* pág. 10437.

Intimamente relacionado al análisis de previsibilidad y el riesgo envuelto, lo que cobra mayor pertinencia cuando se trata de imponer responsabilidad por el acto delictivo de un tercero, está el elemento de nexo causal. Así, en la determinación de cuando existe relación causal entre el daño producido por la conducta criminal de un tercero y la omisión de cumplir con la obligación de tomar precauciones, medidas de seguridad y protección, debe aplicarse el principio de causalidad adecuada, *Elba A.B. v. Universidad de Puerto Rico,* 125 D.P.R. 294, 310 (1990), doctrina que rige en nuestra jurisdicción. *Soc. de Gananciales v. Jerónimo Corp.,* 103 D.P.R. 127, 134 (1974). Como sabemos, conforme a esta teoría *"no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general".* Jaime Santos Briz, *Derecho de Daños,* Ed. Rev. Der. Privado, Madrid (1963), pág. 215. Al tenor, el Tribunal Supremo ha concedido que esta difícil encomienda no puede resolverse de manera plenamente satisfactoria mediante reglas abstractas, y aconseja que en los casos de duda, éstos han de resolverse por el juez según su libre convicción, ponderando todas las circunstancias. Sin embargo, al reconocer de igual forma que no se puede hacer abstracción total de *"la ola criminal que nos arropa",* dicho foro ha determinado que *"la ocurrencia de actos delictivos previos no produce una responsabilidad automática por delitos subsiguientes; más bien el deber de prevenir actos delictivos obliga a tomar medidas razonables de precaución para evitar que ocurran delitos similares... [por lo que] no podemos ser irrazonables y pretender que manos privadas asuman la protección de los ciudadanos. Hay que establecer un balance sin llegar a lo absurdo",* J.A.D.M. v. Centro Comercial Plaza Carolina, et als., supra, págs. 10438-439, en evitación de imputar responsabilidad absoluta a los que así se les reclama. *Colón Miranda v. Plaza Las Américas,* 137 D.P.R. ___ (1994), **94 J.T.S. 84,** pág. 12020.

Es por ello que, para que proceda una acción en la que se reclaman daños de esta naturaleza, entendiendo como daño la consecuencia lesiva imputada por el acto de omisión negligente de no proveer medidas de seguridad adecuadas y razonables, el perjudicado no puede hacer descansar su caso exclusivamente en demostrar la existencia del daño sufrido por éste. Y es que no puede ser de otra manera, toda vez que *"únicamente se le impondrá responsabilidad a un demandado cuando, mediante la presentación de prueba, se ponga al tribunal en condiciones de poder hacer una determinación clara y específica sobre negligencia". Cotto v. C.M. Ins. Co.*, 116 D.P.R. 644, 652 (1963).

En armonía con tales directrices, de manera tal que un reclamante pueda cumplir con su obligación de probar la existencia de la condición de peligrosidad que ocasionó su daño o pérdida en casos como el de marras, y a manera de ejemplo, resultan ilustradoras las expresiones vertidas por el Juez Asociado del Tribunal Supremo, Sr. Rebollo López, en *P. Ricancars, supra*, por lo que procedemos a citarlas íntegramente.

A esos efectos, resulta importante contar con estadísticas sobre los delitos más comunes que se cometen en dichos centros comerciales, si existen variaciones en dichas estadísticas dependiendo de la hora del día, del día de la semana o de la época del año, etc. A base de ello, en su momento, los tribunales estaremos en mejor posición para decidir si las medidas de seguridad existentes en dichos centros comerciales son o no suficientes y razonables; esto es, si dichos centros comerciales han incurrido o no en negligencia en relación con los daños y perjuicios sufridos por los usuarios de sus estacionamientos públicos. *P. Ricancars, Inc. v. Plaza Las Américas, supra*, nota al calce núm. 2, pág. 243.

De otra parte, además de dichas estadísticas, las que pueden surgir y obtenerse a través de la información que al respecto recopila la policía estatal del área correspondiente o del mismo centro comercial de que se trate, o ambos, el Tribunal Supremo ha dado peso a recortes de periódicos donde se evidencie el grado de criminalidad existente dentro de dicha facilidad o en sus inmediaciones, *J.A.D.M. v. Centro Comercial Plaza Carolina, et als., supra*, pág. 10440, lo que entendemos que no es taxativo al momento del reclamante cumplir con su obligación de probar sus alegaciones. Ahora bien, lo que sí emerge con claridad prístina es que, según indicado,

*"para poder responsabilizar a un centro comercial regional por actos delictivos de un tercero cometidos contra un cliente en sus predios, debe haber un quebrantamiento del deber de proveer adecuada y razonable vigilancia. Este deber se basa en la naturaleza de la actividad llevada a cabo...y en la previsibilidad de actos delictivos que depende, a su vez, del conocimiento de actos delictivos previos en [dicho] centro...o de circunstancias que hagan que una persona prudente y razonable pueda anticipar la ocurrencia de tales actos. El quebrantamiento de este deber dependerá de si las medidas tomadas fueron o no adecuadas. La adecuacidad [sic] de las medidas adoptadas dependerá, entre otras cosas, de: (1) la naturaleza del centro comercial y las actividades que allí se llevan a cabo; (2) la naturaleza de la actividad criminal que se está registrando en el área del centro; y de (3) si las medidas de seguridad que se adopten son razonables y van dirigidas a minimizar la posibilidad de que los patrocinadores del centro sufran daños causados por la actividad criminal intencional de terceros." J.A.D.M. v. Centro Comercial Plaza Carolina, et als., supra*, pág. 10,493.

Analicemos, a la luz del marco jurídico expuesto, si en la situación particular del caso de marras la demandante-apelada descargó el peso de la prueba que le correspondía para prevalecer en su acción. Examinaremos, además, si a base de la prueba que aportó la parte demandada y que fue admitida sin oposición, estableció ésta la adecuación de las medidas de seguridad por ella adoptadas y que estaban en vigor (o vigentes) el día de la alegada apropiación ilegal del vehículo propiedad de los demandantes.

## III

En el caso que nos ocupa, el hurto del vehículo de la Sra. Echevarría Ortiz ocurrió en el estacionamiento del centro comercial conocido como Mayaguez Mall, entidad que opera el área de estacionamiento con ánimo indirecto de lucro según ha sido definido por nuestro ordenamiento vigente. Toda vez que la presunción de que el operario ha actuado como depositario del usuario no aplica, se hace necesario que el perjudicado pruebe la existencia de negligencia como base para

imponer responsabilidad por los daños resultantes de la alegada apropiación ilegal de su vehículo.

Acorde con los principios antes expuestos, en el caso que nos ocupa le correspondía a la Sra. Echevarría traer prueba sobre la situación particular del Mayaguez Mall en lo que respecta a la incidencia criminal, ello como base para determinar si las medidas de seguridad existentes en el referido centro comercial eran suficientes y razonables para proteger a los usuarios del estacionamiento de daños resultantes de actos delictivos cometidos por terceros. Es decir, tenían los demandantes-apelados el peso de prueba para establecer la existencia de negligencia imputable a los apelantes bajo la doctrina general de responsabilidad extracontractual. Al tenor, venían obligados a establecer que el plan de seguridad ofrecido por la demandada Mayaguez Mall no satisfacía las garantías mínimas requeridas para mantener a un nivel aceptable la conducta criminal en el área de estacionamiento, lo cual se alega como causa del daño reclamado, o sea, el hurto de su vehículo de dicha área. En palabras del Tribunal Supremo, le era menester *"a dicha parte presentar prueba no sólo del daño sufrido por ella, sino de la existencia de negligencia por parte de [Mayaguez Mall], y de la relación causal entre dicho daño y esa negligencia".* P. Ricancars, Inc. v. Plaza Las Américas, supra, pág. 242.

Según surge de autos, en ocasión de la vista en su fondo la demandante-apelada se limitó, exclusivamente, a ofrecer prueba del hurto de su vehículo. Observamos así que el expediente está totalmente huérfano de prueba tendiente a demostrar que las medidas cautelares implantadas por la demandada fueran inadecuadas o insuficientes para reducir a un mínimo la incidencia de hurtos de automóviles en su área de estacionamiento. De hecho, ninguna prueba aportó de la incidencia de hurto de automóviles o conducta delictiva en el área, de la cual pudiera determinarse el aumento o la disminución de la conducta criminal causante del alegado daño (hurto de vehículos) que estableciera la adecuación, o falta de ella, del plan de vigilancia adoptado por la demandada para el área de estacionamiento. Tampoco sometieron los demandantes copias de reportajes de noticias que cubrieran la incidencia criminal en el establecimiento comercial demandado, o en sus alrededores, que exigieran medidas distintas o más enérgicas para lidiar con la situación imperante, ni se proveyó copia de algún estudio realizado sobre la incidencia de conducta delictiva en áreas similares que demostrara como medidas distintas y más eficientes que las vigentes al momento de los hechos pudieran haber contribuido razonablemente a reducir a un mínimo actos delictivos de igual naturaleza al que le causaron su pérdida. En fin, ninguna prueba aportó para establecer lo desacertadas o inadecuadas que eran las medidas de seguridad adoptadas por los demandados, como base para imputarse responsabilidad por el daño resultante de la apropiación ilegal de su vehículo.

De otra parte, observamos que los demandados-apelantes aportaron prueba, tanto testifical como documental que fue admitida sin oposición, para acreditar y establecer el sistema de seguridad organizado y en funcionamiento para la fecha de la alegada apropiación ilegal. Así estableció dicha parte, mediante prueba que no fue controvertida en forma alguna, las medidas de seguridad y el plan de vigilancia y seguridad que había estructurado y que estaba en vigor el día de la ocurrencia de la alegada apropiación ilegal del vehículo. Según se desprende de la exposición narrativa y de la prueba documental que fue ofrecida y admitida sin oposición, las mismas consistían de garitas o casetas ubicadas en lugares estratégicos del techo de los edificios que componen el Mayaguez Mall, desde los cuales se logra control visual de todas las áreas de estacionamiento y en cada una de éstos un guardia equipado con un radio de comunicación y binoculares; guardias motorizados patrullando cada área del estacionamiento; guardias de seguridad en los pasillos interiores; la presencia de los empleados de mantenimiento, quienes tienen instrucciones que de percatarse de la ocurrencia de algún incidente, deben informarlo a la oficina de administración; así como un cuartel de policía de la División de Tránsito de la Policía de Puerto Rico ubicado en las facilidades del Mayaguez Mall, libre de costos, por el efecto disuasivo que tiene su presencia y el movimiento de vehículos oficiales y policías en el área. En particular, fue el testimonio del Sr. Andrew González que *"[e]se día, a esa hora [refiriéndose al incidente alegado] la vigilancia en Mayaguez Mall consistía de: (a) Cuartel de la Policía de Puerto Rico, División de Tránsito en la parte posterior del Mayaguez Mall; (b) guardias de pasillo --uno en cada pasillo interior; (c) tres guardias de motora-- uno para cada área de estacionamiento; d) guardias en todas las garitas, inclusive uno en el portón del área de carga que ubica frente al área donde estacionó la demandada".* Declaró el Sr. Andrew González, además, que esa área era vigilada por un guardia de seguridad en motora y por un guardia ubicado en la garita que está sobre el techo del Citibank, próximo al área donde estacionó la demandante. Este testimonio, que fue admitido sin

mediar oposición, quedó también corroborado por los documentos que fueron sometidos por estipulación y por el testimonio de la propia demandante. En tales circunstancias, y en ausencia de prueba alguna dirigida a controvertir la aportada por los demandados, resultaba totalmente improcedente la actuación del foro de instancia al descartar la misma.

Evidentemente la prueba aportada por los demandados, ausente prueba alguna sobre problema de actividad criminal en el centro comercial que ameritaran medidas de seguridad mayores, obligan a concluir que las medidas adoptadas para minimizar la posibilidad de que los patrocinadores del centro sufran daños resultantes de actos de naturaleza criminal realizadas por terceros, son adecuadas y razonables. En consecuencia, incidió el foro de instancia primero, al imponer a los demandados-apelantes el peso evidenciario de establecer que tomó las medidas necesarias y diligentes para evitar que ocurriera el daño por el cual se le reclamó. Incidió, además, al concluir, sin base en la prueba, que *"[n]o basta con demostrar que se tienen medidas de seguridad, las mismas deben ser suficientes y razonables a la luz de la incidencia criminal existente en el complejo Mayaguez Mall"*, ██ como base para imponerle responsabilidad.

Al así resolver y según ya indicado, no sólo hizo abstracción total de la normativa vigente, sino que descartó la prueba aportada por la demandada, tanto la testifical, consistente en la declaración del Sr. Juan Andrew González, administrador del centro comercial y persona a cargo de seguridad, como aquélla documental, prueba que en ausencia de otra en contrario, plenamente dejó establecido el descargo de la obligación de las demandadas-apelantes de proveer adecuada y razonable vigilancia en evitación de daños a los clientes y visitantes del centro comercial resultantes de actos delictivos cometidos por terceros. En tales circunstancias, el dictamen apelado a los efectos de que, *"[a] la luz de la prueba presentada por la demandante,* ██ *se decreta que el sistema de vigilancia no fue probado"*, no puede prevalecer.

Finalmente, ante las determinaciones y conclusiones del foro de instancia, debemos señalar que si bien es norma rectora que un tribunal apelativo no intervendrá con la apreciación de la prueba realizada por el Tribunal de Primera Instancia en ausencia de pasión, prejuicio, parcialidad o error manifiesto, Regla 43.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2; *Rodríguez Cancel v. A.E.E.,* 116 D.P.R. 443, 451 (1985); *Ex Parte Valencia,* 116 D.P.R. 909, 912 (1986); *Rivera Pérez v. Cruz Corchado,* 119 D.P.R. 8, 14 (1987); *Benítez v. García,* 126 D.P.R. 302, 308 (1990); *Rodríguez Oyola v. Machado,* 137 D.P.R. ___ (1994), **94 J.T.S. 82,** a la pág. 12008; *Méndez v. Morales,* ___ D.P.R. ___ (1996), **96 J.T.S. 149,** a la pág. 347, regla de abstención y deferencia que obedece a que ante ellos fue que declararon los testigos y fueron ellos quienes tuvieron la oportunidad de verlos y oírlos declarar, *"[e]l arbitrio del juzgador de los hechos es respetable, más no absoluto. Una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora [de un foro apelativo]".* *Vélez v. Srio. de Justicia,* 115 D.P.R. 533, 545 (1984); *Ramos Acosta v. Caparra Dairy, Inc.,* 113 D.P.R. 357 (1982).

De otra parte, tal norma de deferencia no es de aplicación en circunstancias en que la evidencia consista de prueba pericial, de documentos públicos o privados, de deposiciones, estipulaciones escritas u orales, de hechos aceptados o de hechos incontrovertidos. *Sanabria v. Sucn. González,* 82 D.P.R. 885, 995 (1961). Ante esta prueba un tribunal apelativo está en igual posición que los tribunales de instancia.

La aplicación de estos principios a la luz de la prueba testifical que tuvo ante sí el foro de instancia, según reseñada por las partes en la exposición narrativa que sometieron por estipulación, así como la documental que fue admitida sin oposición, nos mueve a concluir que las determinaciones y conclusiones del foro de instancia no encuentran apoyo en la prueba ni representan el balance más racional, justiciero y jurídico de la totalidad de la evidencia que desfiló ante dicho foro. Por lo tanto, no puede prevalecer el dictamen apelado.

## IV

Por los fundamentos antes expuestos se dicta sentencia revocatoria de la apelada y se dispone la desestimación de la demanda en todas sus partes.

Lo acuerda y manda el Tribunal y así lo certifica la señora Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**ESCOLIOS 97 DTA 116**

**1.** Véase Sentencia, Apéndice del recurso, pág. 12.

**2.** Véase Demanda, Apéndice del Recurso, págs. 13-14.

**3.** Véase Contestación a la Demanda, Apéndice Conjunto, pág. 15.

**4.** Véase Informe sobre Conferencia Preliminar entre Abogados, Apéndice Conjunto, págs. 16-20.

**5.** Véase Exposición Narrativa, pág. 2.

**6.** Al respecto, véase la declaración de la Sra. Echevarría, Exposición narrativa de la prueba oral, pág. 2, y el Informe de la Policía.

**7.** Véase Minuta de Vista de 11 de octubre de 1995. Apéndice Conjunto, págs. 21-22.

**8.** Véase Sentencia, Conclusiones de Derecho 12 y 16. Apéndice Conjunto, págs. 9-10.

**9.** Véase Sentencia, Determinaciones de Hechos, Apéndice Conjunto, págs. 5-6.

**10.** Dicho artículo íntegramente ordena que *"el que por acción u omisión causa daño a otro interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización."*

**11.** Esta disposición le adjudica también responsabilidad al Estado por los actos u omisiones de sus empleados en funciones, *"en las mismas circunstancias y condiciones en que sería responsable un ciudadano particular".*

**12.** Esta doctrina emana del principio de que, por regla general, no es anticipable un acto criminal.

**13.** Para una excelente exposición de la trayectoria en Puerto Rico de esta doctrina sobre responsabilidad civil por actos delictivos de terceros, véase *J.A.D.M. v. Centro Comercial Plaza Carolina, et als., supra,* págs. 10346-10348.

**14.** Así, surge la misma obligación entre el porteador y el pasajero, el hotelero y el huesped, la institución educativa y el discípulo, el arrendador y el arrendatario, el patrono y el empleado, etc.

**15.** Ha señalado el Tribunal Supremo que la teoría detrás de la doctrina es que *"cuando una persona o empresa mantiene abierto un establecimiento al público, con el objeto de realizar en dicho establecimiento, operaciones comerciales para su propio beneficio, debe mantener dicho establecimiento en condiciones de seguridad tales, que la persona inducida a penetrar en el mismo, no sufra ningún daño". Gutiérrez v. Bahr,* 78 D.P.R. 473. 474 (1955); *Aponte Betancourt v. Meléndez,* 87 D.P.R. 652, 653 (1963). A los efectos de un centro comercial regional, se debe considerar el estacionamiento como parte de esa área de invitación.

**16.** Véase Sentencia, Conclusión de Derecho Núm. 13, Apéndice Conjunto, pág. 10.

**17.** Aun cuando interpretáramos que el tribunal de instancia se equivocó aquí y que quiso decir *"demandada"*, su determinación no varía el hecho de que la responsabilidad imputada no procede en derecho, según ha quedado consignado.